UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  09-20981-CIV-SCOLA/BANDSTRA-RNS

SOUNG LANAZA, by and through her next friend
and Attorney ad litem, The University of Miami
Children and Youth Law Clinic,

Plaintiff

v.

STATE OF FLORIDA DEPARTMENT
OF CHILDREN AND FAMILY SERVICES;
NEKEITHRICK SWEETING HODRICK, individually,
OUR KIDS, INC., ONE HOPE UNITED, INC.,
formerly known as KIDS HOPE UNITED, INC.,
FRANCES ALLEGRA, individually and ESTATE
OF OLGA ROJAS,

Defendants

_____/

## PLAINTIFF SOUNG LANAZA'S FOURTH AMENDED COMPLAINT

Plaintiff, SOUNG LANAZA, a minor child, by and through the University of Miami

Children and Youth Law Clinic as her attorney *ad litem* and next friend, and by and through

undersigned counsel, sues Defendants, STATE OF FLORIDA DEPARTMENT OF CHILDREN

AND FAMILY SERVICES; ESTATE OF OLGA ROJAS; NAKEITHA SWEETING-

HODRICK, individually; ONE HOPE UNITED, INC., (formerly known as KIDS HOPE

UNITED, INC.); OUR KIDS, INC., and FRANCES ALLEGRA, individually, and states:

## PRELIMINARY STATEMENT

1. This action seeks to redress damages inflicted upon the Plaintiff as a result of the

DEFENDANTS' failure to uphold their duties to ensure that this vulnerable, developmentally

disabled child received the services she needed while in the foster care system for her health,

safety, and well-being, and to ensure she was adopted and not rendered a legal orphan.  Plaintiff

is a special needs child with multiple profound disabilities including cerebral palsy, mild mental retardation, a seizure disorder, and hydrocephaly. She is unable to walk without assistance. The DEFENDANTS failed for years to assess and ensure that Plaintiff's medical and developmental needs resulting from these conditions were met, as well as treatment for her related mental health problems, including low frustration tolerance, verbal outbursts, and other such mood and behavior problems. DEFENDANTS had a duty to Plaintiff to uphold her basic rights under the United States Constitution and as further alleged herein certain DEFENDANTS had a duty to uphold her rights under § 393.13, Florida Statutes, the Bill of Rights of Persons with Developmental Disabilities, but instead repeatedly violated these rights by failing to provide her with the services required to meet her needs while she was in foster care and to protect the integrity of her legal and human rights. DEFENDANTS failed to ensure that Plaintiff received the full extent of services required to achieve her developmental potential while at the DEFENDANTS' mercy while she was in their custody as an orphan and ward of the State. DEFENDANTS left the Plaintiff in foster care for sixteen years of her life, allowed her condition to totally deteriorate, and failed to provide her with the necessary resources to address her multiple disabilities and permit her to become an independent adult. When it was in the DEFENDANTS' financial interest, they quickly closed the case and abandoned the Plaintiff to remain an orphan without adequate financial resources to address her needs and without ever being adopted by a family who could support her lifelong needs. In addition, Plaintiff seeks damages to redress the deprivation, under color of state law, of her rights under the Fourth and Fourteenth Amendments to the United States Constitution because DEFENDANTS grossly disregarded those rights.

## JURISDICTION

2.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, as an action brought pursuant to 42 U.S.C. § 1983, and pursuant to 28 U.S.C. § 1331, as a case brought pursuant to the Constitution and the laws of the United States.  The Court has pendent jurisdiction over Plaintiff's state law claims arising under the laws of Florida.

## PARTIES

3.  DEOTHA WOODBURN (hereinafter "WOODBURN"), is the aunt, former foster parent, and current legal Guardian of SOUNG LANAZA.

4.  Plaintiff, SOUNG LANAZA (sometimes referred to hereafter as "the child"), was born on February 9, 1994.

5.  SOUNG LANAZA was a dependent child with developmental disabilities in the legal custody of the Defendant, STATE OF FLORIDA DEPARTMENT OF CHILDREN AND FAMILY SERVICES (hereinafter "DEPARTMENT") and was dually qualified to receive Social Security disability benefits.

6.  Due to SOUNG LANAZA's status as a minor child, this action is filed through her attorney *ad litem* and next friend the University of Miami School of Law Children and Youth Law Clinic.

7.  SOUNG LANAZA is disabled within the meaning of all legal authorities cited herein due to having: mild mental retardation, cerebral palsy, seizure disorder, Congenital Hydrocephaly, mood and behavior disorders, and an inability to walk without assistance devices.

8.  In addition, she was born cocaine exposed and has always been a child with multiple special needs and developmental disabilities.

3

9. Defendant, the DEPARTMENT, is the Florida state agency charged under state and federal law with the non-delegable duty to ensure the health, welfare, and safety of children in state custody; operating the state foster care system; and providing all necessary services for children placed in its care.

10. At all times material hereto, the DEPARTMENT was responsible to ensure that foster care board rate payments were paid for SOUNG LANAZA while she was in the custody of the DEPARTMENT.

11. Under state law, the DEPARTMENT contracts with private community based agencies to provide foster care and protective service to children in state custody.

12. Defendant, ESTATE OF OLGA ROJAS (hereinafter "ROJAS"), was at all relevant times, employed by the DEPARTMENT as a Family Services Counselor, and was assigned to the Plaintiff's case.

13. At all material times, ROJAS was obligated to comply with all state and federal laws and regulations as well as DEPARTMENT procedures regarding children in state care.

14. As a family services counselor, ROJAS had authority and responsibility:

      a.    To ensure the health, safety and well-being of the child in state custody;

      b.    To conduct monthly home visits to assess the health, safety, and well-being of the child when she was in a foster home;

      c.    To conduct weekly visits to the child while she was in shelter care;

      d.    To ensure that the child was not left in dangerous conditions and was not subject to neglect or abuse;

      e.    To maintain all health records and to inform the caregiver of available services to address any medical needs for the child;

4

f.     To know and understand the full extent of the child's medical and therapeutic needs;

g.     To monitor the child's medication at all times;

h.     To ensure that while SOUNG LANAZA was in state custody, with developmental disabilities, her special needs were addressed so that her condition would not deteriorate;

i.     To apply for social security, Medicaid waiver, and/or other governmental benefits for which the child was eligible;

j.     To ensure that did child does not remain in a temporary shelter for more than thirty days;

k.     To identify relatives willing and able to care for the child;

l.     To timely request a home study through the Interstate Compact for the Placement of Children (hereinafter "ICPC") to expedite the placement of the child with relatives who resided out of the state;

m.    To ensure that an active case plan that met her disability needs remained in effect so long as the child is under the protective supervision of the DEPARTMENT;

n.     To ensure that the child received all necessary medical, psychological, therapeutic and developmental services;

o.     To move a child towards permanency within twelve months of her removal from the home and placement in foster care;

p.     To conduct diligent search on parents whose whereabouts are unknown;

q.     To provide services to the parents, child, and caregivers;

r.     To move towards termination of parental rights when the parents were noncompliant with case plan tasks;

s.     To conduct all tasks required to prepare a child and potential adoptive parents for the adoption process within the required permanency timeframe.

15. Defendant ROJAS is being sued based upon acts that were in her individual capacity.

16. Defendant OUR KIDS, INC. (hereinafter "OUR KIDS"), is a corporation organized and existing under the laws of Florida, and operates its business primarily in Miami-Dade County, Florida.

17. OUR KIDS is the lead agency for coordination and delivery of community-based foster care and related services in Miami-Dade County, Florida, pursuant to § 409.1671, Florida Statutes, and operated under a contract with the DEPARTMENT to provide such services to children in the custody of the DEPARTMENT, including Plaintiff.

18. Defendant, FRANCES ALLEGRA (hereinafter "ALLEGRA"), has been employed by OUR KIDS since its inception in the capacity of Vice President, Chief Operating Officer, and is now the Executive Director.

19. As Vice President, Chief Operating Officer, and Executive Director, ALLEGRA, had authority and responsibility:

a.     To ensure that OUR KIDS upheld its responsibility to ensure the safety of each child in its custody and care.

b.     To oversee the structure of the lead community based care provider for child welfare services in Miami-Dade County;

c.     To oversee the delivery and quality of case management in Miami-Dade to children in the State's custody;

d.    To ensure that subcontractors providing case management services to children in state custody were in compliance with Florida Statutes, Florida Administrative Code, and the DEPARTMENT's policies and procedures;

e.    To ensure that overall, children in foster care and under protective supervision achieved the best permanency option within the timeframe required by the Florida Statutes;

f.    To ensure that policies and procedures of OUR KIDS addressed the duty of case managers and supervisors to provide appropriate and necessary services to children with developmental disabilities who are in the care and custody of the state;

g.    To ensure that children with developmental disabilities in state custody, such as SOUNG LANAZA, did in fact receive the required services and benefits to address their health, safety, and development;

h.    To ensure that the best interest of the children in care took priority over the financial interests of the corporation;

i.    To oversee the budget, salaries, and bonuses of the Our Kids management team.

j.    To run the daily operations of OUR KIDS including ensuring that when she became aware of specific cases of foster children who were in need of assessment, services and permanency, that such services were met and they were not permitted to deteriorate in care.

k.    To ensure that OUR KIDS implemented its contractual responsibilities in accordance with state and federal law

l.    To ensure that OUR KIDS protected the constitutional rights of children who were in its care and custody; in this regard, ALLEGRA knew that those children had the right to be safe, to achieve permanency, to receive an adequate education, to receive necessary treatment and services, and to be screened for and receive services for developmental disabilities.

20. Defendant, ALLEGRA, is being sued in her individual capacity.

21. Defendant, ONE HOPE UNITED, INC. (hereinafter "ONE HOPE"), formerly known as KIDS HOPE UNITED, INC., is a corporation organized and existing under the laws of the State of Florida, and operating its business in Miami-Dade County, Florida.

22. Pursuant to state law, OUR KIDS, as the lead agency, was authorized to and did subcontract with ONE HOPE to provide case management services to children in foster care and under protective supervision, including Plaintiff; notwithstanding that subcontract, OUR KIDS retained ultimate responsibility to ensure that Plaintiff's needs were met by establishing and using the means necessary to confirm and ensure that ONE HOPE did, in fact, meet Plaintiff's needs.

23. Defendant, NAKEITHA SWEETING HODRICK (hereinafter "HODRICK"), was the Vice President and Director of ONE HOPE at all material times.

24. As Vice President and Director, HODRICK, had authority and responsibility:

  a.  To oversee the structure of ONE HOPE in providing child welfare services to children in state custody in Miami-Dade County;

  b.  To oversee the delivery and quality of case management to children in the State's custody;

  c.  To ensure that agents providing case management services to children in state custody were in compliance with Florida Statutes, Florida Administrative Code, and the DEPARTMENT's policies and procedures;

  d.  To ensure that overall, children in foster care and under protective supervision achieved the best permanency option within the timeframe required by the Florida Statutes;

e.       To ensure that policies and procedures of ONE HOPE addressed the duty of case managers and supervisors to provide appropriate and necessary services and benefits to ensure the safety of children with developmental disabilities who are in the care and custody of the state;

f.       To ensure that children with developmental disabilities in state custody, such as SOUNG LANAZA, did in fact receive the required services and benefits to address their health, safety, and development;

g.       To ensure that the best interest of the children in care took priority over the financial interests of KIDS HOPE and OUR KIDS;

25. Defendant, HODRICK, is being sued in her individual capacity.

## GENERAL ALLEGATIONS

### THE FIRST FIVE YEARS

26. Shortly after her birth in February 1994, SOUNG LANAZA was removed by the State of Florida from her biological mother's care after a medical determination that she had been exposed before birth to illegal substances that are damaging to fetal development.

27. On or about February 23, 1994, a ventriculo-peritoneal shunt was implanted in the child to treat her hydrocephaly; however, it became infected shortly thereafter and needed to be removed and replaced after twenty one days of antibiotics.

28. On or around August 31, 1994, pursuant to Chapter 39 of the Florida Statutes, SOUNG LANAZA was adjudicated dependent and placed in the legal custody of the DEPARTMENT.

29. On or about September 30, 1994, SOUNG LANAZA was ready to be discharged from the hospital; however, the DEPARTMENT failed to find a home for her for at least one to two weeks until she was placed in a shelter.

30. On or about December 7, 1994, the DEPARTMENT was put on notice that Plaintiff's aunt, and licensed foster parent in New York, DEOTHA WOODBURN, was interested in taking custody of the child and was an appropriate placement.

31. For the first year of her life, during which time a fully nurturing home environment is crucial to a child's health, development, and attachment, the DEPARTMENT left SOUNG LANAZA in a shelter environment that was designed only to be a thirty day temporary placement until a foster home could be located.

32. On or about July 25, 1995, agents of the DEPARTMENT documented that WOODBURN was making regular contact with the DEPARTMENT showing concern for the child and expressing a desire to care for her.

33. In 1995, the Plaintiff was finally removed from the temporary shelter, but despite the availability of WOODBURN and another relative willing and able to care for her, she was placed in the group home of a non-relative, Delcita Bartley.

34. Ms. Bartley was paid a monthly foster care board rate of over $2,200.00 throughout Plaintiff's stay there until 1999.

35. Between 1994 and 1999, notwithstanding state law requirements and best practices that the DEFENDANTS give adult relatives priority consideration and ultimately place the child with available relatives, and despite the actual availability of WOODBURN to care for the child, the DEFENDANTS kept SOUNG LANAZA the group home in non-relative foster care.

36. On or about October 5, 1997, while SOUNG LANAZA was in the Bartley Group Home and in the DEPARTMENT's care, she fell out of her wheelchair and was injured. The circumstances regarding the fall were a clear warning that her needs were not being met.

37. On or about January 6, 1998, an independent Citizen Review Panel pursuant to Florida Statute section 39.702 documented that the DEPARTMENT had failed to move the case forward timely, that the DEPARTMENT failed to ensure that a case plan was in effect when the previous case plan had been expired for at least six months, that the DEPARTMENT delayed the Interstate Compact needed to place SOUNG LANAZA with relatives, that the DEFENDANTS failed to apply for the child's social security benefits, and that the DEPARTMENT had a complete lack of knowledge of the child's medication.

38. It was not until March 1998, approximately four years after SOUNG LANAZA's placement in foster care, that the DEPARTMENT delinquently initiated an Interstate Compact for the Placement of Children (hereinafter "ICPC") to finally place SOUNG LANAZA with her relative, WOODBURN in New York.

39. On or about April 8, 1998, case notes confirmed the DEPARTMENT had still failed to ensure that SOUNG LANAZA received necessary developmental services, including toilet training, and even diapers in the Delcita Bartley group home; this was further warning that the placement was not meeting her needs.

40. On March 3, 1998, pursuant to the ICPC requirement that a state sending a child for placement in another state must assure the receiving state that the child will receive the financial support required to meet her needs, the DEPARTMENT represented to New York state child welfare authorities, in writing, that WOODBURN would receive the foster care board rate benefits in addition to the Plaintiff's Social Security disability benefits.

41. The DEPARTMENT likewise led WOODBURN to believe that she would receive the foster care board rate equal to that of the prior foster parent, over $2,200.00, to provide for SOUNG LANAZA's special needs.

42. In addition, the DEPARTMENT admitted to WOODBURN that the health, safety, and well being of SOUNG LANAZA had not been met in the Delcita Bartley group home.

43. On or about January 19, 1999, SOUNG LANAZA fell again in the Bartley group home and had to be taken to the hospital for stitches in her forehead; this was yet another warning that her needs were not being met in that home.

44. In or about July 1999, in reliance on the DEPARTMENT's assurance of that financial support to both New York and WOODBURN, New York agreed to place SOUNG LANAZA WOODBURN.

45. Pursuant to the ICPC, SOUNG LANAZA remained a ward of Florida under the courtesy supervision of New York's child protection system.

46. Upon the child's arrival in New York, WOODBURN discovered that Defendants had allowed her niece to deteriorate, failed to properly care for her, and allowed her to be abused, in that: she suffered from a scalp fungus comparable to ring worm; was wheelchair bound and unable to stand; was mobile only by means of a "bunny hop;" suffered from blackened skin, scrapes, and bruises on both knees and her toes as a result of being on all fours; was terrified of bathing, therefore violently refusing to do so; despite being 4 years old, had not been toilet trained and frequently defecated on herself; was unable to communicate verbally, not even on a basic toddler level; and regularly exhibited severe aggressive and angry behavior for which no comprehensive behavioral intervention program had been implemented.

**FAILURE TO ACHIEVE PERMANENCY**

47. The DEFENDANTS owed SOUNG LANAZA a duty to meet her custodial, medical, development, and emotional needs and to provide the best possible legal permanency status for lifelong purposes, which in this case was adoption by WOODBURN.

12

48. Pursuant to Florida Statute § 39.001(1)(h) (2000), Florida Statute § 39.45(2) (1994), and consistent with the federal Adoption and Safe Families Act, DEFENDANTS had a duty to meet SOUNG LANAZA's need for a permanent placement with a biological or adoptive family, a duty to provide the necessary support to secure that placement, and a duty to ensure that she did not remain in foster care for more than one year.

49. Notwithstanding the state and federal law requirement for permanency within one year, the DEPARTMENT failed to timely terminate parental rights and facilitate an adoption to ensure that SOUNG LANAZA reached permanency within one year; instead the DEPARTMENT waited four years to even make the child available for adoption.

50. It was not until September 16, 1999, more than four years after the removal of the child, that the DEPARTMENT took the first step towards permanency by securing termination of the mother's parental rights.

51. On November 16, 1999 the DEPARTMENT finally obtained termination of the father's rights, making SOUNG LANAZA available for adoption.

52. Between 1999 and 2002, pursuant to the promise made by the DEPARTMENT through the Interstate Compact for the Placement of Children to financially support the needs of the child, Plaintiff's aunt, DEOTHA WOODBURN, received the promised financial support to care for the child for her first three years of placement.

53. In February 2002, motivated by its own financial interests, the DEPARTMENT sought and obtained an Order from the Florida Dependency Court to terminate court supervision of the Defendants' handling of SOUNG LANAZA'S case and instead of adoption, finalized a permanency goal of Long Term Relative Care (notably, there was no guardian *ad litem* to advocate for Plaintiff's best interests).

54. Though WOODBURN expressed a desire to adopt SOUNG LANAZA since she was born, DEFENDANTS failed to ensure that an adoption took place, thereby depriving SOUNG LANAZA of a forever family which was in her best interest and for which she was entitled by state and federal law and making her a ward of the state.

**WOODBURN'S FINANCIAL SUPPORT WAS DECREASED BY THIRTY PERCENT**

55. In July 2002, shortly after terminating supervision, the DEPARTMENT applied, without obtaining Dependency Court approval or oversight, to become the representative payee for SOUNG LANAZA's social security benefits and in turn did receive those monies and applied the SSI to its exclusive institutional benefit.

56. This change in SOUNG LANAZA's Representative Payee decreased the monies that could have been directed to WOODBURN to meet Plaintiff's needs by at least 30 percent and in contravention of the original promise to deliver all of the available funding streams to her which was made to induce WOODBURN into becoming Plaintiff's caregiver.

**SOUNG LANAZA'S CONDITION DETERIORATES AS A RESULT OF FAILURE TO PROVIDE NECESSARY, AVAILABLE SERVICES**

57. On June 5, 2004, because DEFENDANTS failed to inform WOODBURN that SOUNG LANAZA's Ventriculo-Peritoneal Shunt, necessary to drain the fluid from her brain, must be replaced as she grows; there was need for emergency surgery to correct a very painful and dangerous VP Shunt malfunction/fracture in her neck.

58. The DEPARTMENT, OUR KIDS, ONE HOPE, and ROJAS failed to provide WOODBURN with the child's medical history such as allergies to medications, birth records, and the medical history of the parents which was critical information required when SOUNG LANAZA was hospitalized.

59. In addition, because DEFENDANTS failed to secure Medicaid Waiver benefits and neglected the child's medical and developmental needs, when SOUNG LANAZA's condition deteriorated, there were no in-home nursing supports available, and at one point, WOODBURN was required to carry Plaintiff up and down the stairs while the child was in a wheelchair because she was not mobile.

60. DEFENDANTS failed to identify service providers and the child's needs, therefore, WOODBURN had to herself explore medical option to address the child's deformed legs that were preventing her ability to walk.

61. In May 2005, OUR KIDS reviewed SOUNG LANAZA's case file as part of the transition to community based care and found serious deficiencies in the case's handling.

62. In 2007, because she had been neglected and abused while in the care of the DEFENDANTS, SOUNG LANAZA had to undergo multiple surgeries to straighten both of her legs including bilateral tendo Achilles lengthening, bilateral hamstring releases, and bilateral hip abductor releases and transfers to improve her ability to ambulate and function.

63. During the years following placement, WOODBURN provided care as best she could for her niece within her limited resources, while continuing to ask the DEFENDANTS for the financial assistance she needed to adequately care for SOUNG LANAZA's multiple disabilities.

## OUR KIDS BECOMES REPRESENTATIVE PAYEE

64. On January 23, 2008, after the privatization of child protective services in Miami-Dade County, OUR KIDS submitted its application to the Social Security Administration (SSA) to replace the DEPARTMENT as SOUNG LANAZA's Representative Payee and was awarded that status by the SSA.

65. In order to advance its financial interests, OUR KIDS misrepresented on the SSA application that Plaintiff did not live with relatives or have relatives who had an interest in being SOUNG LANAZA's representative payee, but in doing so, perpetuated the 30 percent loss of financial assistance for WOODBURN to meet Plaintiff's needs.

**DEFENDANTS CONTINUED TO FAIL TO PROVIDE NECESSARY SERVICES**

66. Throughout SOUNG LANAZA'S placement with WOODBURN, DEFENDANTS failed in their ongoing duty to offer or provide WOODBURN any support services in her home to secure SOUNG LANAZA's placement and to ensure her prosperity.

67. To meet her needs, DEFENDANTS had the duty to make Plaintiff eligible to benefit from all programs for which she was eligible and, pursuant to Florida Administrative Rule 65C-16.013, to pay an enhanced adoption subsidy for SOUNG LANAZA as a child with physical, mental, emotional, and/or behavioral problems which require care, supervision, and structure beyond that ordinarily provided in a family setting.

68. Throughout the sixteen years that Plaintiff remained in foster care status and in the legal custody of the DEPARTMENT, the DEFENDANTS failed to ensure that this child with highly complex disabilities received Medicaid Waiver benefits which would have assisted her in obtaining the services she needed at home and up to approximately $70,000 per year in additional benefits to ensure her health, safety, well-being, and development.

69. Under Medicaid Waiver, SOUNG LANAZA would have received benefits to which she was entitled to provide for her specialized and extensive care needs in her day to day living including habilitation services, respite care, service coordination, adaptive technologies, one on one supervision at home, transportation assistance, recreational activities, etc.

70. In violation of federal and state law and best practices, the DEPARTMENT, OUR KIDS, ONE HOPE, and ROJAS failed to involve WOODBURN in the case planning process which is intended to ensure that (a) the caregiver and the case manager understand the full scope of services needed for a child like the Plaintiff; (b) the caregiver understands her role and tasks in achieving permanency and best interests; (c) the caregiver understands the permanency options and decisions which needed to be made within the state and federal time limits; and (d) to ensure that SOUNG LANAZA did not remain in foster as a legal orphan when not in her best interests.

**TERMINATING SUPERVISION, CUTTING BENEFITS AND NO ADOPTION**

71. The DEFENDANTS acted to maximize their financial interests in seizing Plaintiff's Social Security disability benefits, thus minimizing Plaintiff's available revenue and rendering her a legal orphan.

72. Only in March 2010, when the New York Social Security Administration office responded to an inquiry by WOODBURN for relief by requesting a court order clarifying SOUNG LANAZA's custodial status relative to the DEPARTMENT and therefore right to receive Plaintiff's Social Security benefits as her designated Representative Payee, did the DEFENDANTS' misdeeds begin to unravel.

73. Thereafter, the DEFENDANTS failed to provide the custody order, thus prompting the Social Security Administration to designate WOODBURN as the Representative Payee in place of OUR KIDS for SOUNG LANAZA's Social Security benefits.

74. On April 7, 2010, when DEFENDANTS could no longer achieve a financial benefit, they acted to cause WOODBURN to become Plaintiff's permanent guardian, terminated any protective supervision, ended all foster care benefits, abandoned Plaintiff without any financial

assistance, relinquished jurisdiction to the State of New York and left Plaintiff without any

adoptive parents after 16 years even though they had terminated Plaintiff's parental rights.

75. As a result of these actions, Plaintiff was further harmed in that WOODBURN could now

only receive SOUNG LANAZA's Social Security benefits to assist in meeting Plaintiff's

extensive special needs and developmental disabilities; this resulted in an approximate 60

percent reduction in funds available to meet the Plaintiff's needs compared with what the

Defendants promised would be delivered in 1999 to the New York authorities and to

WOODBURN.

## COUNT I- NEGLIGENCE CLAIM AGAINST DEFENDANT, OUR KIDS, INC.

76.     Plaintiff reavers and realleges paragraphs 1-8; 16-20; 22; 26-29; 32-35; 40-41; 45-

48; 53-54; 57-75 as if fully set forth herein.

77.     OUR KIDS, through its agents and/or employees, owed Plaintiff the following

non-delegable duties:

a.   To provide continuity of care for SOUNG LANAZA from her entry into foster care until

her exit pursuant to Florida Statute § 409.1671(1)(e)(2);

b.   To be accountable for meeting the outcomes and performance standards relating to the

child protective services provided to SOUNG LANAZA pursuant to Florida Statute §

409.1671(1)(e)(4);

c.   To use reasonable care in the supervision and oversight of SOUNG LANAZA to ensure

her health, welfare, and safety needs were met, including as expressly contemplated, affirmed

and delineated in Chapter 39 of the Florida Statutes, the Florida Administrative Code and other

written policies and procedures issued by the DEPARTMENT and OUR KIDS;

d. To ensure SOUNG LANAZA's individual dignity, liberty, pursuit of happiness, and the protection of her federally guaranteed civil and other legal rights pursuant to Florida Statute § 39.4085(2);

e. To ensure that personnel providing services to SOUNG LANAZA be sufficiently qualified, experienced and diligent to meet her needs while she was in State custody pursuant to Florida Statute § 39.4085(4);

f. To ensure that SOUNG LANAZA received meaningful case management and planning that would have returned her to a rehabilitated family of origin or moved her to another permanency result timely, at the very least within the time frames required by federal and state law pursuant to Florida Statute §§ 39.4085(13); 39.001(1)(h) (2010); 39.45(2) (1994);

g. To ensure that SOUNG LANAZA was in a safe permanent home within twelve months of foster care placement or eighteen months of removal pursuant to Florida Statute §§ 39.001(1)(h) (2010); 39.45(2) (1994);

h. To ensure that a valid and effective case plan was in effect at all times while the child is in care pursuant to Florida Statute § 39.6011(1) and Florida Administrative Code 10M-6.131(9);

i. To facilitate the foster parent's participation in case planning and service delivery pursuant to Florida Statute § 39.6011;

j. To act as an advocate for the child in terms of obtaining needed services pursuant to Florida Administrative Code 10M-6.131(17);

k. To ensure that SOUNG LANAZA was afforded prompt access to all available state and federal programs that were created specifically for persons with her disabilities and status as a dependent child, including, but not limited to Early Periodic Screening, Diagnosis, and Testing

(EPSDT) Services, developmental services programs, Medicare and supplemental security income, Children's Medical Services pursuant to Florida Statute § 39.4085(23);

l. To initiate appropriate action to involve other departmental and community programs that provide services that the child may need pursuant to Florida Administrative Rule 10M-6.131 and Florida Statute §§ 20.19(1)(c); 39.001; 409.1671;

m. To ensure that SOUNG LANAZA received a full risk, health, educational, medical, and psychological screening, and assessment and testing upon adjudication into foster care pursuant to Florida Statute § 39.4085(6);

n. To ensure SOUNG LANAZA's safety by providing necessary medical, emotional, psychological, psychiatric, and educational evaluations and treatment, as soon as practicable after identification of the need for such services by the screening and assessment process pursuant to Florida Statute § 39.4085(6);

o. To ensure SOUNG LANAZA's safety, health, and well being by addressing her developmental disabilities while she was in the care and custody of the State Florida pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

p. To ensure that SOUNG LANAZA received all Medicaid Waiver benefits to which she was entitled while she was in the care and custody of the State pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

q. To ensure that SOUNG LANAZA's caregiver received adequate financial support and services to secure the health and safety of SOUNG LANAZA and to address her special needs as they relate to her developmental disabilities pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

r.  To identify developmental delays or conditions and obtain any documentation to support the need for developmental services and ensure that an application for developmental services is submitted once SOUNG LANAZA'S needs were determined pursuant to Florida Administrative Code 65C-28.004;

s.  To explore timely and as a priority for placement, all available options for SOUNG LANAZA with available relatives who were willing and able to care for her and ultimately adopt her pursuant to Florida Statute § 39.401(4); 39.4085; and CFOP 175-88;

t.  To prepare the caregiver, prior to the placement of SOUNG LANAZA with her, as to how to meet her many and varied special needs pursuant to Florida Administrative Code 65C-28.005;

u.  To provide the necessary support to strengthen and maintain the child's placement over time pursuant to Florida Administrative Code 65C-28.005;

v.  To inform and educate the caregiver about available programs that may provide financial and medical assistance for the child pursuant to Florida Administrative Code 65C-28.005;

w.  To provide the caregiver with information regarding the dependency process and support services available in the community pursuant to Florida Administrative Code 65C-28.005;

x.  To inform the caregiver of all identified needs of the child and the need to provide services for those needs pursuant to Florida Administrative Code 65C-28.005;

y.  To ensure that significant events in the child's life are recorded in a format that can be used by subsequent caregivers and professionals pursuant to Florida Administrative Code 10M-6.131(10);

z. To maintain, review, and provide the foster parent with a Child Resource Record with a complete record of the child's health records pursuant to Florida Administrative Code 65C-28.005 and Florida Administrative Code 10M-6.131(10);

aa. Notwithstanding her disabilities, to assess and provide for pre-independent living services for SOUNG LANAZA upon turning thirteen years of age and independent living services upon turning fifteen years of age pursuant to Florida Administrative Code 65C-28.009(7)(d);

bb. To ensure that the child and relatives are not likely to need supervision or services from OUR KIDS to ensure the stability of the permanent guardianship when the recommendation is made to terminate supervision with a goal of permanent guardianship pursuant to Florida Statute § 39.6221 and Florida Administrative Code 65C-30.012.

78. OUR KIDS, through its agents and/or employees, breached said non-discretionary, non-delegable duties.

79. As a direct and proximate result of the aforementioned breach, Plaintiff SOUNG LANAZA was damaged by not receiving adequate care and services to address her developmental disabilities while in the care and custody of the state; by remaining in foster care for the majority of her minor life; and by suffering and continuing to suffer deterioration in her health. These losses are either permanent or continuing in nature and Plaintiff will suffer such losses in the future.

WHEREFORE, Plaintiff, SOUNG LANAZA demands judgment against Defendant OUR KIDS, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT II- NEGLIGENCE CLAIM AGAINST DEFENDANT, ONE HOPE UNITED, INC.

80. Plaintiff reavers and realleges paragraphs 1-8; 21-28; 32-35; 44-48; 53-54; 57-60; 62; 66-75 as if fully set forth herein.

81. ONE HOPE, through its agents and/or employees, owed Plaintiff the following non-delegable duties:

a. To use reasonable care in the supervision and oversight of SOUNG LANAZA to ensure her health, welfare, and safety needs were met, including as expressly contemplated, affirmed and delineated in Chapter 39 of the Florida Statutes, the Florida Administrative Code and other written policies and procedures issued by the DEPARTMENT, OUR KIDS, and ONE HOPE;

b. To ensure SOUNG LANAZA's individual dignity, liberty, pursuit of happiness, and the protection of her federally guaranteed civil and other legal rights pursuant to Florida Statute § 39.4085(2);

c. To ensure that personnel providing services to SOUNG LANAZA be sufficiently qualified, experienced and diligent to meet her needs while she was in State custody pursuant to Florida Statute § 39.4085(4);

d. To ensure that SOUNG LANAZA received meaningful case management and planning that would have returned her to a rehabilitated family of origin or moved her to another permanency result timely, at the very least within the time frames required by federal and state law pursuant to Florida Statute §§ 39.4085(13); 39.001(1)(h) (2010); 39.45(2) (1994);

e. To ensure that SOUNG LANAZA was in a safe permanent home within twelve months of foster care placement or eighteen months of removal pursuant to Florida Statute §§ 39.001(1)(h) (2010); 39.45(2) (1994);

f.  To ensure that a valid and effective case plan was in effect at all times while the child is in care pursuant to Florida Statute § 39.6011(1) and Florida Administrative Code 10M-6.131(9);

g.  To facilitate the foster parent's participation in case planning and service delivery pursuant to Florida Statute § 39.6011;

h.  To act as an advocate for the child in terms of obtaining needed services pursuant to Florida Administrative Code 10M-6.131(17);

i.  To ensure that SOUNG LANAZA was afforded prompt access to all available state and federal programs that were created specifically for persons with her disabilities and status as a dependent child, including, but not limited to Early Periodic Screening, Diagnosis, and Testing (EPSDT) Services, developmental services programs, Medicare and supplemental security income, Children's Medical Services pursuant to Florida Statute § 39.4085(23);

j.  To initiate appropriate action to involve other departmental and community programs that provide services that the child may need pursuant to Florida Administrative Rule 10M-6.131 and Florida Statute §§ 20.19(1)(c); 39.001; 409.1671;

k.  To ensure that SOUNG LANAZA received a full risk, health, educational, medical, and psychological screening, and assessment and testing upon adjudication into foster care pursuant to Florida Statute § 39.4085(6);

l.  To ensure SOUNG LANAZA's safety by providing necessary medical, emotional, psychological, psychiatric, and educational evaluations and treatment, as soon as practicable after identification of the need for such services by the screening and assessment process pursuant to Florida Statute § 39.4085(6);

m. To ensure SOUNG LANAZA's safety, health, and well being by addressing her developmental disabilities while she was in the care and custody of the State Florida pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

n. To ensure that SOUNG LANAZA received all Medicaid Waiver benefits to which she was entitled while she was in the care and custody of the State Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

o. To ensure that SOUNG LANAZA's caregiver received adequate financial support and services to secure the health and safety of SOUNG LANAZA and to address her special needs as they relate to her developmental disabilities pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

p. To identify developmental delays or conditions and obtain any documentation to support the need for developmental services and ensure that an application for developmental services is submitted once SOUNG LANAZA'S needs were determined pursuant to Florida Administrative Code 65C-28.004;

q. To explore timely and as a priority for placement, all available options for SOUNG LANAZA with available relatives who were willing and able to care for her and ultimately adopt her pursuant to Florida Statute § 39.401(4); 39.4085; and CFOP 175-88;

r. To prepare the caregiver, prior to the placement of SOUNG LANAZA with her, as to how to meet her many and varied special needs pursuant to Florida Administrative Code 65C-28.005;

s. To provide the necessary support to strengthen and maintain the child's placement over time pursuant to Florida Administrative Code 65C-28.005;

t.  To inform and educate the caregiver about available programs that may provide financial and medical assistance for the child pursuant to Florida Administrative Code 65C-28.005;

u.  To provide the caregiver with information regarding the dependency process and support services available in the community pursuant to Florida Administrative Code 65C-28.005;

v.  To inform the caregiver of all identified needs of the child and the need to provide services for those needs pursuant to Florida Administrative Code 65C-28.005;

w.  To ensure that significant events in the child's life are recorded in a format that can be used by subsequent caregivers and professionals pursuant to Florida Administrative Code 10M-6.131(10);

x.  To maintain, review, and provide the foster parent with a Child Resource Record with a complete record of the child's health records pursuant to Florida Administrative Code 65C-28.005 and Florida Administrative Code 10M-6.131(10);

y.  Notwithstanding her disabilities, to assess and provide for pre-independent living services for SOUNG LANAZA upon turning thirteen years of age and independent living services upon turning fifteen years of age pursuant to Florida Administrative Code 65C-28.009(7)(d);

z.  To ensure that the child and relatives are not likely to need supervision or services of ONE HOPE to ensure the stability of the permanent guardianship when the recommendation is made to terminate supervision with a goal of permanent guardianship pursuant to Florida Statute § 39.6221 and Florida Administrative Code 65C-30.012.

82.  ONE HOPE, through its agents and/or employees, breached said non-discretionary, non-delegable duties.

83.  As a direct and proximate result of the aforementioned breach, Plaintiff SOUNG LANAZA was damaged by not receiving adequate care and services to address her

developmental disabilities while in the care and custody of the State; by remaining in foster care for the majority of her minor life; and by suffering and continuing to suffer deterioration in her health. These losses are either permanent or continuing in nature and Plaintiff will suffer such losses in the future.

WHEREFORE, Plaintiff, SOUNG LANAZA demands judgment against Defendant, ONE HOPE, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT III - § 393.13  CLAIM AGAINST DEFENDANT, OUR KIDS, INC.

84.     Plaintiff reavers and realleges paragraphs 1-8; 16-20; 22; 26-29; 32-35; 40-41; 45-48; 53-54; 57-75 as if fully set forth herein.

85.     While SOUNG LANAZA was in State custody and under the supervision of OUR KIDS, her rights under the Bill of Rights of Persons who are Developmentally Disabled § 393.13, Florida Statutes, include, but are not limited to:

    a. The right to receive prompt and appropriate medical treatment and care for physical and mental ailments and for the prevention of any illness or disability pursuant to Florida Statute § 393.13(4)(c);

    b. The right to be free from harm, abuse and neglect pursuant to Florida Statute § 393.13(3)(a) and (g);

    c. The right to receive services, within available sources, which protect her personal liberty pursuant to Florida Statute § 393.13(3)(c);

    d. The right to receive prompt and appropriate medical treatment and care for physical and mental ailments and for the prevention of any illness or disability pursuant to Florida Statute § 393.13(4)(c).

27

86.     OUR KIDS had a duty to ensure that SOUNG LANAZA's rights under §393.13, Florida Statutes were not violated.

87.     OUR KIDS breached said duty, and as a direct and proximate result of the aforementioned breach, Plaintiff SOUNG LANAZA did not receive adequate care and services to address her developmental disabilities while in the care and custody of the state, remained in foster care for the majority of her minor life, and suffered and will continue to suffer deterioration in her health.  The losses are either permanent or continuing in nature and Plaintiff will suffer such losses in the future.

WHEREFORE, Plaintiff, SOUNG LANAZA demands judgment against Defendant OUR KIDS, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT IV- § 393.13 CLAIM AGAINST DEFENDANT, ONE HOPE UNITED, INC.

88.     Plaintiff reavers and realleges paragraphs 1-8; 21-28; 32-35; 44-48; 53-54; 57-60; 62; 66-75 as if fully set forth herein.

89.     While SOUNG LANAZA was in State custody and under the supervision of ONE HOPE, her rights under the Bill of Rights of Persons who are Developmentally Disabled § 393.13, Florida Statutes, include, but are not limited to:

a. The right to receive prompt and appropriate medical treatment and care for physical and mental ailments and for the prevention of any illness or disability pursuant to Florida Statute § 393.13(4)(c);

b. The right to be free from harm, abuse and neglect pursuant to Florida Statute § 393.13(3)(a) and (g);

28

    c.  The right to receive services, within available sources, which protect her personal liberty pursuant to Florida Statute § 393.13(3)(c)

    d.  The right to receive prompt and appropriate medical treatment and care for physical and mental ailments and for the prevention of any illness or disability pursuant to Florida Statute § 393.13(4)(c).

90.    ONE HOPE had a duty to ensure that SOUNG LANAZA's rights under §393.13, Florida Statutes were not violated.

91.    ONE HOPE breached said duty, and as a direct and proximate result of the aforementioned breach, Plaintiff SOUNG LANAZA did not receive adequate care and services to address her developmental disabilities while in the care and custody of the state, remained in foster care for the majority of her minor life, and suffered and will continue to suffer deterioration in her health. The losses are either permanent or continuing in nature and Plaintiff will suffer such losses in the future.

WHEREFORE, Plaintiff, SOUNG LANAZA demands judgment against Defendant ONE HOPE, INC., for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT V- 42 U.S.C. § 1983 CLAIM AGAINST ONE HOPE UNITED, INC. AND NAKEITHA HODRICK

92.    Plaintiff reavers and realleges paragraphs 1-8; 21-28; 32-35; 44-48; 53-54; 57-60; 62; 66-75 as if fully set forth herein.

93.    This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of Plaintiff's federally guaranteed rights, including those under the Fourteenth Amendment of the United States Constitution.

94.     At all times relevant hereto, Defendant ONE HOPE was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

95.     At all times relevant hereto, Defendant, HODRICK, as the Vice President and Director of ONE HOPE, was acting under the color of state law and was acting or purporting to act in the performance of her official duties.

96.     At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

97.     At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional right to be safe and free from unreasonable risk of harm.

98.     At all times material hereto, ONE HOPE and HODRICK were deliberately indifferent and/or acted with reckless disregard to the Plaintiff's health, safety, and welfare and Constitutional rights, including without limitation by failing to properly train, supervise, and monitor case workers.

99.     ONE HOPE and HODRICK violated Plaintiff's Constitutional rights in that:

a.     ONE HOPE and HODRCIK established and enforced customs, policies or practices which resulted in much longer stays and harm to foster children in its care compared with children in other districts in Florida, without achieving an appropriate permanency goal and in excess of the maximum twelve month timeframe allowed by state and federal law.

b.     ONE HOPE and HODRICK enforced a custom, policy, or practice which prioritized the financial interests of the agency over the best interests of the child, as was done to the Plaintiff;

     c.    ONE HOPE accepted the transfer of SOUNG LANAZA'S care from the DCF and OUR KIDS as part of the transfer to a Community Based Care system, while knowing from a transfer check list that her file did not contain many critical documents necessary to assess her needs and confirm that her needs were being met, while not taking action to otherwise locate and obtain missing documents and by not contacting DEOTHA WOODBURN or any other person to obtain necessary information that would have been contained within the missing documents.

     d.    ONE HOPE owed to children who, like SOUNG LANAZA, were placed in other states pursuant to the Interstate Compact on the Placement of Children (ICPC), the same duty that was owed to children placed within Florida to assess and provide for all required and necessary disability, medical and any other services, but nonetheless failed to ensure that those assessments and services were in fact provided.

     e.    ONE HOPE likewise failed to ensure a system was put into place to confirm that children, like SOUNG LANAZA, who were placed out of state pursuant to the ICPC, had their needs properly and adequately assessed and were provided with all required and necessary disability, medical and any other services.

     f.    ONE HOPE was required, but failed, to ensure that children it provided services to, including SOUNG LANAZA, were safe and well-nurtured and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

     g.    ONE HOPE was required, but failed, to ensure that children it provided services to, including SOUNG LANAZA, had their social, emotional, intellectual and physical

development needs met and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

h.    ONE HOPE was required, but failed, to ensure that a comprehensive health assessment was obtained for each and every child under its care, including SOUNG LANAZA, and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

i.    ONE HOPE was responsible, but failed, to ensure that any child under its care, including SOUNG LANAZA, who was eligible for developmental disability services received those services and that a support plan was in place to assess and coordinate those services, and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

j.    ONE HOPE was responsible, but failed, to ensure that any child under its care who was suspected to need developmental disability services, including SOUNG LANAZA, was assessed to determine and confirm any such needs, and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

k.    ONE HOPE was responsible, but failed, to ensure that any child and foster family under its care, including SOUNG LANAZA and DEOTHA WOODBURN, received necessary and appropriate services to allow the child to achieve the best permanency option possible.

l.    ONE HOPE was responsible, but failed, to ensure that any foster parent of any child under its care, including DEOTHA WOODBURN, received necessary education and training (including on an ongoing basis, not just before initial placement) on meeting the special needs of any developmentally disabled foster child, like SOUNG LANAZA, and likewise failed

32

to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

      m.    ONE HOPE was responsible, but failed, to ensure that any child under its care, including SOUNG LANAZA, had their needs for transportation to access necessary services, including developmental disability services, assessed and provided for and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

      n.    ONE HOPE was responsible, but failed, to ensure that any child under its care, including SOUNG LANAZA, had a complete and accurate case plan that addressed their needs consistent with their level of care, and to review and amend those case plans on an ongoing basis as needed in order to assess the status of case plan tasks and to determine any need for service referrals.

      o.    ONE HOPE was responsible, but failed, to ensure that an effective procedure was in place to monitor and confirm that complete and accurate case plans were in place for each child under its care, including SOUNG LANAZA.

      p.    ONE HOPE was responsible, but failed, to ensure that case plans for any child under its care, including SOUNG LANAZA, were developed in collaboration with his or her caregiver, including foster parents like DEOTHA WOODBURN in order to ensure it accounted for all information as to the needs of the child, and that the case plans included family goals, needs and strengths, child safety factors and risk level; likewise, ONE HOPE failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

q.     ONE HOPE owed to children who, like SOUNG LANAZA, were placed in other states pursuant to the Interstate Compact on the Placement of Children (ICPC), the same duty that was owed to children placed within Florida to ensure that case plans were developed in collaboration with their caregivers, including foster parents like DEOTHA WOODBURN, but violated that duty; ONE HOPE likewise failed to ensure a system was put into place to confirm case plans for children placed in other states under the ICPC were developed in collaboration with their caregivers.

r.     ONE HOPE was responsible, but failed, to ensure that it timely obtained reports from all service providers for any child under its care, including SOUNG LANAZA, for quality decision-making and compliance in connection with case planning; likewise, ONE HOPE failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

s.     ONE HOPE was responsible, but failed, to obtain and maintain certification by Medicaid to offer to eligible children who, like SOUNG LANAZA, have mental health problems, targeted case management services; this duty extended both to children placed in Florida and those placed out of Florida under the ICPC; likewise, ONE HOPE failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

t.     ONE HOPE was responsible, but failed, to seek and obtain Medicaid waiver services to eligible children like SOUNG LANAZA, who are developmentally disabled; this duty extended both to children placed in Florida and those placed out of Florida under the ICPC; likewise, ONE HOPE failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

u.     ONE HOPE was responsible, but failed, to make efforts to reduce the length of stay of children in care, like SOUNG LANAZA, consistent with statewide goals by effectively staffing cases to determine what was needed to move towards permanency, including putting all necessary and available services in place to support the foster child and caregiver, like DEOTHA WOODBURN.

v.     ONE HOPE and HODRICK enforced customs, policies, or practices which resulted in the failure to assess her and provide SOUNG LANAZA, and other disabled dependent children like her, with the available services which could meet her specialized health and developmental needs;

w.     SOUNG LANAZA was left in foster care for the first sixteen years of her life, five of those years were the fault of  ONE HOPE; thereafter, ONE HOPE and HODRICK established and enforced customs, policies, or practices under which SOUNG LANAZA was unnecessarily rendered ineligible for available financial assistance to address her medical, physical, developmental, emotional, and behavioral needs; deprived her of extensive services which should have been available to her through the independent living program; and left her caregiver with inadequate financial assistance in amounts three times less than that which was initially promised to her.

x.     ONE HOPE and HODRICK knew that in order to achieve the optimal permanency option for a developmentally disabled children like SOUNG LANAZA, it was critical to provide foster parents, like DEOTHA WOODBURN, with all necessary and available financial and other supports to meet the children's special needs; ONE HOPE and HODRICK knew that failing to do so placed such children at substantial risk of serious harm, but failed to ensure that the supports were provided.

    y.    HODRICK personally participated in acts along with her subordinates that caused violations to SOUNG LANAZA'S constitutionally-protected rights and she personally made decisions with regard to LANAZA, to wit:

    i. HODRICK was aware of systemic concerns and problems with the administration of psychotropic medications to foster children who did not have a behavior treatment plan that use of such medications required for their safety and welfare, both short-term and long-term, including such concerns that were raised and confirmed in 2008 by the Gabriel Meyers Work Group that was assembled by the Secretary of the DCF.

    ii. HODRICK was aware that SOUNG LANAZA had been placed on psychotropic medications, but failed to determine and confirm she had a behavior treatment plan in place after such information was requested by the Central Office of DCF specifically as to her case.

    iii. SOUNG LANAZA never received a behavior treatment plan, nor did she receive all of the behavioral services that could and should have been provided under such a plan.

    iv. She was informed that WOODBURN was raising concerns that she was not receiving enough money to take care of Plaintiff LANAZA, and that she had been raising those concerns for approximately five years, but she directed no action to assess Plaintiff LANAZA's needs and whether the level of funding being provided was sufficient;

v. She was informed that WOODBURN was raising concerns that she was not receiving enough money to take care of Plaintiff LANAZA, and that she had been raising those concerns for approximately five years, but she directed no action to determine whether the assigned level of care that governed the amount of monies paid for support was accurate and appropriate;

vi. She was informed that WOODBURN was raising concerns that she was not receiving enough money to take care of Plaintiff LANAZA, and that she had been raising those concerns for approximately five years, but she directed no action to resolve the financial distress by achieving an adoption after LANAZA had spent over a decade without permanency;

vii. HODRICK knew that prior to SOUNG LANAZA being placed with DEOTHA WOODBURN in 1999, she was maintained in a foster home which was provided over $2,800 per month to meet her needs.

viii. HODRICK knew that DEOTHA WOODBURN had a very limited income of less than $400 per month and that upon SOUNG LANAZA'S initial placement with her in 1999, she had been provided for LANAZA'S support and needs a board rate of $1,200 per month, plus LANAZA'S SSI benefits as the representative payee of those benefits, which at that time were over $550 per month, for a total some one-third less than the financial support of the prior foster placement.

Case 1:09-cv-20981-RNS   Document 302   Entered on FLSD Docket 04/25/2012   Page 38 of 70

ix. HODRICK knew that in 2002, DCF took action to replace itself as representative payee of the SSI benefits, used those benefits to reimburse itself in part for the board rate and did nothing to replace the revenue that WOODBURN lost to care for LANAZA; at this time, the financial support being provided was approximately sixty percent less than the amount provided in 1999.

x. HODRICK knew that between 2002 and 2009, DEOTHA WOODBURN continued to complain that the SSI benefits had never been replaced and HODRICK knew that the board rate remained at the original $1,200 level from 1999, with no adjustment for cost of living increases.

xi. Notwithstanding this knowledge, in 2009 HODRICK personally advocated for and secured in SOUNG LANAZA'S dependency Court the worst possible permanency option for LANAZA in terms of receiving necessary financial support, permanent guardianship; that option caused WOODBURN to lose her entire existing board payment and replace it with only LANAZA'S SSI benefits, for which she could then become representative payee, in an amount that at that time was only $697 per month; thus, she was left in 2009 with an seriously inadequate level of financial support that was approximately 40 percent less than had been provided for LANAZA from 2002 through 2009, approximately 60 percent less than was provided from 1999 to

2002, and 75 percent less than was provided to the Florida foster home in 1999.

xii. The other permanency option that could and should have been achieved with proper supports was adoption, which would have provided at least $2,000 per month in an enhanced adoption subsidy that had already been approved to meet LANAZA'S needs and that could have been much higher than that had a proper needs assessment been performed.

xiii. HODRICK advocated for the permanency option of permanent guardianship while knowing not only that the necessary consent of DEOTHA WOODBURN had not been obtained, but that she objected to the option under the totality of the financial and related circumstances which left on LANAZA's SSI of $697 per month to care for her and to meet her extensive disability and living needs.

xiv. In addition, HODRICK knew in 1999 at the time of the permanent guardianship Order, that all supervision of LANAZA by the DCF, OUR KIDS and ONE HOPE would case and that services provided through the foster care system would also cease, but did nothing to ensure that necessary developmental and other services were in place.

xv. HODRICK took this action without making any effort to confirm that LANAZA'S needs could be met under that option and without ensuring that LANAZA had been properly referred for all necessary

and available services to meet her needs as developmentally disabled child, including Medicaid Waiver services.

xvi.   HODRICK was aware that SOUNG LANAZA was among the top 100 children of the approximately 20,000 in the entire state of Florida who were in foster care the longest.

xvii.   HODRICK was aware that SOUNG LANAZA was among one of ten children under the care of ONE HOPE who were in foster care in Florida the longest and likewise aware that ONE HOPE had under its care a disproportionate share of foster children in care the longest state-wide compared with other case management agencies.

xviii.   HODRICK was aware that achieving an appropriate permanency result was in LANAZA'S best interests and rights, but she took no appropriate action to address that lack of permanency when DCF and OUR KIDS raised such concerns when she could and should have done so.

100.   As to SOUNG LANAZA and any other child placed out of state under the ICPC, all of the duties and responsibilities set forth herein as to ONE HOPE and HODRICK were non-delegable to the states in which those children were placed and, in fact, were expressly retained under Florida law and the policies and procedures of DCF, which applied to ONE HOPE and HODRICK.

101.   DEFENDANTS, ONE HOPE and HODRICK's took said actions knowing they were exposing children who were in State custody, including SOUNG LANAZA, to a substantial risk of serious harm.

102.    At all times that ONE HOPE and HODRICK were taking the actions described herein, it was clearly established that developmentally disabled children in the physical custody of the state foster care system, like the Plaintiff, have the Constitutionally and federally protected right to receive the necessary, most appropriate and best available services to address all of their developmental disability needs, medical needs and emotional/behavioral needs, as well as the right to reach their best permanency option in a timely manner.

103.    Despite possessing the authority and means to remedy the unconstitutional treatment of the child, ONE HOPE and HODRICK were deliberately indifferent and/or recklessly failed to take immediate action to ensure that the Plaintiff and other dependent children like her received all necessary treatment and services to meet identified needs and to reach the appropriate permanency goal timely.

104.    ONE HOPE'S and HODRICK's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the Plaintiff and other dependent children like her to suffer physical harm, medical harm, developmental harm, psychological trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

105.    Plaintiff is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, the Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant ONE HOPE and HODRICK for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VI- 42 U.S.C. § 1983 CLAIM AGAINST OUR KIDS, INC. AND FRANCES ALLEGRA

106.    Plaintiff reavers and realleges paragraphs 1-8; 16-20; 22; 26-29; 32-35; 40-41; 45-48; 53-54; 57-75 as if fully set forth herein.

107.    This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of Plaintiff's guarantee rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoption and Safe Families Act.

108.    At all times relevant hereto, Defendant, OUR KIDS, was a "person" and was acting under the color of state law within the meaning of 42 U.S.C. § 1983.

109.    At all times relevant hereto, Defendant, ALLEGRA, as Executive Director of OUR KIDS, was acting under the color of state law and was acting or purporting to act in the performance of her official duties.

110.    At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

111.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutionally-protected right to be safe and free from unreasonable risk of harm.

112.    At all times material hereto, OUR KIDS and ALLEGRA were deliberately indifferent and/or acted with reckless disregard to the Plaintiff's health, safety, and welfare and Constitutional and federal rights, including without limitation by failing to properly train, supervise, and monitor case workers.

113.   OUR KIDS and ALLEGRA established and maintained an unconstitutional system of care that could never ensure the safety and well-being of foster children, including SOUNG LANAZA, because it abdicated its constitutional and statutory duties to ensure that each child in its care was free from harm by delegating all responsibility to its subcontractors, including ONE HOPE, with no direct supervision, no participation in case staffings, or any other case involvement that would be necessary to meeting its constitutional and statutory duties, resulting in a child welfare system that permitted case managers to operate unchecked, unsupervised, and blatantly ignore and/or deliberately fail to learn of the plethora of red flags and warning signs that SOUNG LANAZA'S needs were not being properly assessed and provided for, and that her foster parent, DEOTHA WOODBURN, was not receiving the necessary training and supports to meet those needs and establish permanency timely and adequately. In this regard, OUR KIDS and ALLEGRA violated Plaintiff's Constitutional rights in that:

a.   OUR KIDS and ALLEGRA accepted responsibility for the care of children including SOUNG LANAZA as part of the transfer to a Community Based Care system, knowing that her DCF files did not contain many critical documents necessary to assess her needs and confirm that her needs were being met.

b.   OUR KIDS and ALLEGRA accepted the inadequate file of SOUNG LANAZA and other foster children because of pressure from DCF to accept incomplete files under a transition schedule that was originally planned for ten months, but then compressed to four months by DCF.

c.   Despite bowing to that pressure and knowing of the deficient files, OUR KIDS and ALLEGRA did not take action to otherwise locate and obtain missing documents for such children including SOUNG LANAZA and did not contact any other person to obtain

43

necessary information that would have been contained within the missing documents for SOUNG or any other children.

        d.    OUR KIDS and ALLEGRA then assigned SOUNG LANAZA'S case to ONE HOPE, while knowing from a file transfer check list that her file did not contain many critical documents necessary to assess her needs and confirm that her needs were being met, while not taking action to otherwise locate and obtain missing documents and by not contacting DEOTHA WOODBURN or any other person to obtain necessary information that would have been contained within the missing documents.

        e.    OUR KIDS and ALLEGRA accepted responsibility for the care of children including SOUNG LANAZA as part of the transfer to a Community Based Care system, without otherwise ever independently assessing their needs and confirming that her needs or needs of other children were being met, before or after assigning the case to ONE HOPE.

        f.    OUR KIDS and ALLEGRA established and enforced a custom, policy, or practice which encouraged and allowed children in foster care, including SOUNG LANAZA, whose parents' rights had been terminated, to remain in foster care for many years in excess of the maximum twelve month timeframe allowed by state and federal law without achieving an appropriate permanency goal.

        g.    OUR KIDS and ALLEGRA established and enforced customs, policies, or practices which resulted in much longer stays for foster children under its care without achieving permanency compared with children in other districts in Florida.

        h.    OUR KIDS and ALLEGRA enforced a custom, policy, or practice which prioritized the financial interests of the agency over the best interests of the child, as was done to the Plaintiff.

i.      OUR KIDS owed to children who, like SOUNG LANAZA, were placed in other states pursuant to the Interstate Compact on the Placement of Children (ICPC), the same duty that was owed to children placed within Florida to assess and provide for all required and necessary disability, medical and any other services, but nonetheless failed to ensure that those assessments and services were in fact provided.

j.      OUR KIDS likewise failed to ensure a system was put into place to confirm that children, like SOUNG LANAZA, who were placed out of state pursuant to the ICPC were properly and adequately assessed and provided with all required and necessary disability, medical and any other services.

k.      OUR KIDS was required, but failed, to ensure that children it provided services to, including SOUNG LANAZA, were safe and well-nurtured and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

l.      OUR KIDS was required, but failed, to ensure that children it provided services to, including SOUNG LANAZA, had their social, emotional, intellectual and physical development needs met and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

m.      OUR KIDS was required, but failed, to ensure that a comprehensive health assessment was obtained for each and every child under its care, including SOUNG LANAZA, and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

n.      OUR KIDS was responsible, but failed to ensure that any child under its care who was eligible for developmental disability services received those services, including

SOUNG LANAZA, and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

    o.    OUR KIDS was responsible, but failed, to ensure that any child under its care who was suspected to need developmental disability services, including SOUNG LANAZA, was assessed to determine and confirm any such needs and that a support plan was in place to assess and coordinate those services, and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

    p.    OUR KIDS was responsible, but failed, to ensure that any child and foster family under its care, including SOUNG LANAZA and DEOTHA WOODBURN, received necessary and appropriate services to allow the child to achieve the best permanency option possible.

    q.    OUR KIDS was responsible, but failed, to ensure that any foster parent of any child under its care, including DEOTHA WOODBURN, received necessary education and training (including on an ongoing basis, not just before initial placement) on meeting the special needs of any developmentally disabled foster child, like SOUNG LANAZA, and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

    r.    OUR KIDS was responsible, but failed, to ensure that any child under its care, including SOUNG LANAZA, had their needs for transportation to access necessary services, including developmental disability services, assessed and provided for and likewise failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

s.    OUR KIDS was responsible, but failed, to ensure that any child under its care, including SOUNG LANAZA, had a complete and accurate case plan that addressed their needs consistent with their level of care, and to review and amend those case plans on an ongoing basis as needed in order to assess the status of case plan tasks and to determine any need for service referrals.

t.    OUR KIDS was responsible, but failed, to ensure that an effective procedure was in place to monitor and confirm that complete and accurate case plans were in place for each child under its care, including SOUNG LANAZA.

u.    OUR KIDS was responsible, but failed, to ensure that case plans for children under its care, including SOUNG LANAZA, were developed in collaboration with their caregivers, including foster parents like DEOTHA WOODBURN, in order to ensure it accounted for all information as to the needs of the child, and that the case plans included family goals, needs and strengths, child safety factors and risk level; likewise, OUR KIDS failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

v.    OUR KIDS owed to children who, like SOUNG LANAZA, were placed in other states pursuant to the Interstate Compact on the Placement of Children (ICPC), the same duty that was owed to children placed within Florida to ensure that case plans were developed in collaboration with their caregivers, including foster parents like DEOTHA WOODBURN, but violated that duty; OUR KIDS likewise failed to ensure a system was put into place to confirm case plans for children placed in other states under the ICPC were developed in collaboration with their caregivers.

w.    OUR KIDS was responsible, but failed, to ensure that it timely obtained reports from all service providers for any child under its care, including SOUNG LANAZA, for

quality decision-making and compliance in connection with case planning; likewise, OUR KIDS failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

x.    OUR KIDS was responsible, but failed, to obtain and maintain certification by Medicaid to offer to eligible children who, like SOUNG LANAZA, have mental health problems, targeted case management services; this duty extended both to children placed in Florida and those placed out of Florida under the ICPC; likewise, OUR KIDS failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

y.    OUR KIDS was responsible, but failed, to seek and obtain Medicaid waiver services to eligible children like SOUNG LANAZA, who are developmentally disabled; this duty extended both to children placed in Florida and those placed out of Florida under the ICPC; likewise, OUR KIDS failed to ensure an effective procedure was in place to monitor and confirm these facts for each child in care.

z.    OUR KIDS was responsible, but failed, to make efforts to reduce the length of stay of children in care, like SOUNG LANAZA, consistent with statewide goals by effectively staffing cases to determine what was needed to move towards permanency, including by putting all necessary and available services in place to support the foster child and caregiver, like DEOTHA WOODBURN.

aa.    OUR KIDS was aware, but took no appropriate action, to address the fact that it had within its care a significantly disproportionate share of children in Florida in foster care the longest, including 25 of the top 100 foster children in care the longest out of a total foster care population of approximately 20,000 children.

bb.    OUR KIDS and ALLEGRA knew that in order to achieve the optimal permanency option for a developmentally disabled children like SOUNG LANAZA, it was critical to provide foster parents, like DEOTHA WOODBURN, with all necessary and available financial and other supports to meet the children's special needs; OUR KIDS and ALLEGRA knew that failing to do so placed such children at substantial risk of serious harm, but failed to ensure that the supports were provided.

cc.    ALLEGRA personally participated in acts along with her subordinates that caused violations to SOUNG LANAZA'S constitutionally-protected rights and she personally made decisions with regard to LANAZA with knowledge of the existence of a substantial risk of serious harm, to wit:

   i.  She was repeatedly informed that WOODBURN was raising concerns that she was not receiving enough money to take care of Plaintiff LANAZA, and that she had been raising those concerns for approximately five years, but she directed no action to assess whether the level of funding being provided to me LANAZAS was sufficient when it was not;

   ii. She was repeatedly informed that WOODBURN was raising concerns that she was not receiving enough money to take care of Plaintiff LANAZA, and that she had been raising those concerns for approximately five years, but she directed no action to determine whether the assigned level of care that governed the amount of monies paid for support was accurate and appropriate when it did not met her needs;

   iii. She was repeatedly informed that WOODBURN was raising concerns that she was not receiving enough money to take care of Plaintiff LANAZA, and that she had been raising those concerns for approximately five years, but she directed no action to

resolve the financial distress by achieving an adoption after LANAZA had spent over a decade without permanency;

iv. She was personally aware of systemic concerns and problems with the administration of psychotropic medications to foster children who did not have a behavior treatment plan that use of such medications required for their safety and welfare, both short-term and long-term, including such concerns that were raised and confirmed in 2008 by the Gabriel Meyers Work Group that assembled by the Secretary of the DCF;

v. She was personally aware through her receipt of reports of the identity of foster children, including SOUNG LANAZA, who were on psychotropic medications without there being in place a behavior treatment plan to address her behavioral needs;

vi. SOUNG LANAZA never received a comprehensive behavior treatment plan, nor did she receive all of the behavioral services that could and should have been provided under such a plan which caused and contributed her to deterioration.

vii. ALLEGRA was personally aware no later than September 2008 that DCF had raised concerns about the 25 children in OUR KIDS care including SOUNG LANAZA who were in the top 100 children of the approximately 20,000 in the entire state of Florida who were in foster care the longest, and she was aware of the urgency that these children achieve an appropriate permanency result, but she took no appropriate action to urgently address that lack of permanency for SOUNG LANAZA;

viii. ALLEGRA participated in and orchestrated the OUR KIDS' policies and procedures under which the transfer of SOUNG LANAZA'S care from the DCF was accepted, as described above, and then assigned to ONE HOPE, while the file transfer check list

showed her file was missing many critical documents to assess her needs and confirm that her needs were being met.

114.    As to SOUNG LANAZA and any other child placed out of state under the ICPC, all of the duties and responsibilities set forth herein as to OUR KIDS and ALLEGRA were non-delegable to the states in which those children were placed and, in fact, were expressly retained under Florida law and the policies and procedures of DCF, which applied to OUR KIDS and ALLEGRA.

115.    To the extent that OUR KIDS attempted to delegate to ONE HOPE and other case management agencies any of its duties owed to foster children by virtue of its contract with DCF, including SOUNG LANAZA, OUR KIDS still owed a duty to ensure that ONE HOPE upheld the rights of each individual child by putting in place policies and procedures to confirm their needs were met.

116.    In this regard, OUR KIDS maintained ultimate responsibility to ensure that children in its care received adequate care and protection from harm and was required to, but failed, to implement policies and procedures to verify the accuracy or ensure the completeness of information provided by ONE HOPE concerning the welfare of foster children, including LANAZA.

117.    OUR KIDS violated its duties to oversee ONE HOPE and other case management agencies by making deliberate choices from among various alternatives that created known risks that foster children under its care would not receive adequate care and protection from harm, and these policies were a substantial factor in the violation of LANAZA'S rights, as follows:

      a.  Establishing and maintaining a system of care involving use of subcontracting to other agencies, including ONE HOPE, without monitoring and confirming that

the needs of each child were met, including SOUNG LANAZA, thus engaging in a deliberate failure to learn of the children's conditions and deliberate failure to check and verify that their needs were being met and their constitutionally-protected upheld by the subcontracted agencies;

b. Relying only on "quality assurance system" of a random sampling of a small percentage of cases being handled by ONE HOPE to verify their performance, rather than implementing a system which would ensure regular review of each file of each child in care to confirm that each child's need were being assessed and met; in this regard, OUR KIDS never comprehensively reviewed the handling of SOUNG LANAZA'S case by ONE HOPE in over four years to confirm that her needs were being assessed and met;

c. Failing to ensure that cases involving developmentally disabled children like SOUNG LANAZA who were placed out of state under the ICPC were ever reviewed to ensure that their special needs were being met; the only possible review was if such a file happened to fall into the random "quality assurance system" described above.

118.    At times that OUR KIDS and ALLEGRA were taking the actions described herein, it was clearly established that developmentally disabled children in the physical custody of the state foster care system, like the Plaintiff, have the Constitutionally and federally protected right to receive the necessary, most appropriate and best available services to address all of their developmental disability needs, medical needs and emotional/behavioral needs, as well as the Constitutionally-protected right to reach their best permanency option in a timely manner.

119.    DEFENDANTS, OUR KIDS and ALLEGRA's took said actions knowing they were exposing children who were in State custody, including SOUNG LANAZA, to a substantial risk of serious harm.

120.    Despite possessing the authority and means to remedy the unconstitutional treatment of the child, OUR KIDS and ALLEGRA were deliberately indifferent and/or recklessly failed to take immediate action to ensure that the Plaintiff and other dependent children like her received all necessary treatment and services and reached the appropriate permanency goal.

121.    As a direct and proximate result of OUR KIDS' and ALLEGRA's deliberate indifference and/or recklessness, the Plaintiff and other dependent children like her suffered physical harm, medical harm, developmental harm, psychological trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

122.    Plaintiff is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, the Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendants, OUR KIDS and ALLEGRA for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VII- 42 U.S.C § 1983 CLAIM AGAINST DEFENDANT, OLGA ROJAS

123.    Plaintiff reavers and realleges paragraphs 1- 17; 26-63; 66-75 as if fully set forth herein.

124.    This action arises under and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

125.    At all times relevant hereto, Defendant ROJAS, as the Family Services Counselor, was acting under the color of state law and was acting or purporting to act in the performance of her official duties.

126.    At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

127.    At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

128.    At all times material hereto, ROJAS was deliberately indifferent and/or acted with reckless disregard to the Plaintiff's health, safety, and welfare and Constitutional and federal rights.

129.    ROJAS violated Plaintiff's Constitutional and federal rights in that:

a.    She failed to ensure that a case plan was in effect at all times while SOUNG LANAZA was in the custody of the state;

b.    She failed to move the case towards permanency to ensure that SOUNG LANAZA was adopted within the statutory timeframe, which resulted in SOUNG LANAZA remaining in foster care for sixteen years and ultimately remaining an orphan and ward of the state;

c. She failed to timely initiate the ICPC despite awareness that relatives were willing and eager to care for SOUNG LANAZA;

d. She failed to monitor SOUNG LANAZA's medication despite her knowledge that the child had extensive medical needs and developmental disabilities;

e. She failed to ensure that SOUNG LANAZA received the social security benefits to assist with her disabilities;

f. She failed to properly assess the child's safety while she was in Delcita Bartley's group home;

g. She failed to ensure the health and safety of SOUNG LANAZA while she was in the Delcita Bartley's group home group resulting in the continued deterioration of a child with extensive developmental disabilities.

130. Defendant ROJAS took said actions knowing they would deprive the child of her constitutional and federal rights and expose her to a substantial risk of harm.

131. At all times that ROJAS was taking the actions described herein, it was clearly established that developmentally disabled children in the physical custody of the state foster care system, like the Plaintiff, have the Constitutional and federal right to receive the necessary, most appropriate and best available services to address all of their developmental disability needs, medical needs and emotional/behavioral needs, as well as the Constitutional and federal right to reach their best permanency option in a timely manner.

132. Despite possessing the authority and means to remedy the unconstitutional treatment of the child, ROJAS was deliberately indifferent and/or recklessly failed to take immediate action to ensure that the Plaintiff and other dependent children like her received all necessary treatment and services and reached the appropriate permanency goal timely.

133.    ROJAS's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the Plaintiff to suffer physical harm, medical harm, developmental harm, psychological trauma, pain and suffering, deterioration, and other reasonably foreseeable damages.

134.    Plaintiff is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. § 1988.

WHEREFORE, the Plaintiff prays that this Honorable Court enter a judgment in favor of Plaintiff against Defendant, ROJAS for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VIII- ESTOPPEL/RESTITUTION CLAIM AGAINST DEFENDANT STATE OF FLORIDA DEPARTMENT OF CHILDREN AND FAMILY SERVICES

135.    Plaintiff reavers and realleges paragraphs 1- 20; 22; 26-63; 66-75 as if fully set forth herein.

136.    On or about March 3, 1998, the DEPARTMENT promised WOODBURN in writing through the ICPC that she would receive on Plaintiff's behalf specific financial assistance to which SOUNG LANAZA was entitled to receive under state and federal laws to ensure that WOODBURN could provide for PLAINTIFF's ongoing specialized care and health needs.

137.    The DEPARTMENT knew or reasonably should have known that its promise to deliver sufficient financial benefits for Plaintiff's care would induce WOODBURN to rely upon that promise and assert an ability to meet Plaintiff's needs when agreeing to become her primary caregiver.

138.   The DEPARTMENT knew that New York would not and could not agree to supervise the Plaintiff's care pursuant to the ICPC unless the DEPARTMENT delivered adequate financial assistance and funds to which the Plaintiff was entitled in order to meet her needs.

139.   WOODBURN, on behalf of the Plaintiff, did in fact reasonably rely upon the DEPARTMENT's promise to deliver the agreed upon foster care board rate and other financial benefits to which the Plaintiff was entitled, including without limitation Medicaid benefits and Social Security disability benefits.

140.   Between 1999 and 2002, WOODBURN received on Plaintiff's behalf the agreed upon financial assistance and benefits to which Plaintiff was entitled; however, in 2002 and continuing each year thereafter, the DEPARTMENT, by and through its agent OUR KIDS, and/or OUR KIDS, illegally intercepted many of the funds to which Plaintiff was entitled by applying to become SOUNG LANAZA's registered payee of social security benefits and did so by materially misinforming the Social Security Administration on an annual basis as to Plaintiff's true status; as a direct and proximate result, Plaintiff was denied receipt of significant support monies to which she was entitled to receive through WOODBURN.

141.   WOODBURN, on Plaintiff's behalf, detrimentally relied upon the DEPARTMENT'S promise to provide adequate financial support and delivery of Plaintiff's public benefits; in turn, WOODBURN was forced to provide as best she could for SOUNG LANAZA'S extensive and specialized needs with significantly less financial resources than she should have.

142.    As a direct and proximate result, Plaintiff suffered and was not able to have her needs met as fully and comprehensively by WOODBURN as should have been possible and she was injured.

143.    Justice requires that the promise made by the DEPARTMENT through the ICPC to provide adequate financial assistance and specific benefits for the care of SOUNG LANAZA be enforced to ensure the delivery to the Plaintiff of continued quality care and services for her health and well-being and that the DEPARTMENT and OUR KIDS be disgorged of improperly retained funds and restore all monies belonging to Plaintiff that were misappropriated into the Defendants' accounts.

WHEREFORE, Plaintiff, SOUNG LANAZA demands judgment against Defendants FLORIDA DEPARTMENT OF CHILDREN AND FAMILY SERVICES and OUR KIDS, for restitution equal to the amount promised in the ICPC request for the care of SOUNG LANAZA since 2002, costs, and all other such relief as the Court may deem just and proper.

## COUNT IX- NEGLIGENCE CLAIM AGAINST DEFENDANT, STATE OF FLORIDA DEPARTMENT OF CHILDREN AND FAMILY SERVICES

144.    Plaintiff reavers and realleges paragraphs 1-75 as if fully set forth herein.

145.    Pursuant to § 768.28, Florida Statutes, Plaintiff notified the DEPARTMENT of this claim six months or more prior to the filing of this Fourth Amended Complaint, and all conditions precedent have been performed.

146.    The DEPARTMENT, through its agents and/or employees, owed Plaintiff the following non-delegable duties:

a.    To provide continuity of care for SOUNG LANAZA from her entry into foster care until her exit;

b. To ensure that contracted and subcontracted community based-care providers, including, but not limited to, OUR KIDS and ONE HOPE, met the outcomes and performance standards relating to the child protective services provided to SOUNG LANAZA pursuant to Florida Statute § 409.1671(2)(a);

c. To use reasonable care in the supervision and oversight of SOUNG LANAZA to ensure her health, welfare, and safety needs were met, including as expressly contemplated, affirmed and delineated in Chapter 39 of the Florida Statutes, the Florida Administrative Code and other written policies and procedures issued by the DEPARTMENT;

d. To ensure SOUNG LANAZA's individual dignity, liberty, pursuit of happiness, and the protection of her federally guaranteed civil and other legal rights pursuant to Florida Statute § 39.4085(2);

e. To ensure that personnel providing services to SOUNG LANAZA be sufficiently qualified, experienced and diligent to meet her needs while she was in State custody pursuant to Florida Statute § 39.4085(4);

f. To ensure that SOUNG LANAZA received meaningful case management and planning that would enabled her to achieve permanency, at the very least within the time frames required by federal and state law pursuant to Florida Statute §§ 39.4085(13); 39.001(1)(h) (2010); 39.45(2) (1994).

g. To ensure that SOUNG LANAZA received a Comprehensive Behavioral Health Assessment ("CBHA") upon her entry into shelter care, pursuant to Florida Administrative Code Rule 65C-28.014, and CFOPs 155-10 and 175-40.

h. To ensure that SOUNG LANAZA received a CBHA to assist in determining services that would allow her to maintain her placement upon her exhibiting emotional or

behavioral issues that might result in the child losing her placement, pursuant to Florida Administrative Code Rule 65C-28.014 and CFOP 155-10.

i.   To ensure that all services identified through a CBHA were referred and implemented within thirty (30) days of identification of the need, and if they were not initiated to document the reasons why services were not initiated, pursuant to Florida Administrative Code Rule 65C-28.014 and CFOP 155-10.

j.   To ensure that all service needs identified in a CBHA were implemented into a case plan within thirty (30) days of identification of the need pursuant to Florida Administrative Code Rules 65C-28.014, 65C-30.006, and CFOP 155-10.

k.   To ensure that SOUNG LANAZA received a full risk, health, educational, medical, and psychological screening, and assessment and testing upon adjudication into foster care pursuant to Florida Statute § 39.4085(6);

l.   To ensure SOUNG LANAZA's safety by providing necessary medical, emotional, psychological, psychiatric, and educational evaluations and treatment, as soon as practicable after identification of the need for such services by the screening and assessment process pursuant to Florida Statute § 39.4085(6);

m.  To ensure that when a special need was recognized or suspected, that steps were taken within three (3) working days to address the need, including ensuring that a referral for a CBHA was made to address a mental health special need; ensuring that an appointment was made to screen the child by her primary care physician or appropriate medical personnel for determination of the child's need; ensuring that the child was referred to the local CMAT if a medical special need was suspected or identified to ensure services were coordinated in accordance with the Medical Foster Care Statewide Operational Plan; ensuring that when a child

was suspected or identified as having a developmental delay or condition, any documentation to support the need for developmental services were obtained and eligibility for developmental services was applied for as soon as the need was recognized; encouraging and providing necessary support to the caregiver in participating in the assessment or medical evaluation process, ensuring that when a disability was determined, the person making the placement provided the results of the assessment or medical examination to the placement authority as soon as possible; coordinating the transfer of information between the caregiver, physician, and the placement unit, pursuant to Florida Administrative Code 65C-28.004.

n.  To ensure that SOUNG LANAZA was afforded prompt access to all available state and federal programs that were created specifically for persons with her disabilities and status as a dependent child, including, but not limited to Early Periodic Screening, Diagnosis, and Testing (EPSDT) Services, developmental services programs, Medicaid Waiver Services, Medicare and supplemental security income, Children's Medical Services pursuant to Florida Statute § 39.4085(23);

o.  To ensure that SOUNG LANAZA was in a safe permanent home within twelve months of foster care placement or eighteen months of removal pursuant to Florida Statute §§ 39.001(1)(h) (2010); 39.45(2) (1994);

p.  To facilitate the foster parent's participation in case planning and service delivery pursuant to Florida Statute § 39.6011 and Florida Administrative Code 65C-30.006.

q.  To initiate appropriate action to involve other departmental and community programs that provide services that the child may need pursuant to the Florida Administrative Code and Florida Statute §§ 20.19(1)(c); 39.001;

r.  To ensure that upon case transfer to a contracted providers, a staffing was held providing detailed information about the case pursuant to Florida Administrative Code Rule 30.002;

s.  To ensure SOUNG LANAZA's safety, health, and well being by addressing her developmental disabilities while she was in the care and custody of the State Florida pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

t.  To ensure that SOUNG LANAZA received all Medicaid Waiver benefits to which she was entitled while she was in the care and custody of the State pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

u.  To ensure that SOUNG LANAZA's caregiver received adequate financial support and services to secure the health and safety of SOUNG LANAZA and to address her special needs as they relate to her developmental disabilities pursuant to Florida Administrative Code 65C-28.004 and Florida Statute § 393.13;

v.  To identify developmental delays or conditions and obtain any documentation to support the need for developmental services and ensure that an application for developmental services was submitted once SOUNG LANAZA'S needs were determined pursuant to Florida Administrative Code 65C-28.004;

w.  To ensure that SOUNG LANAZA'S physical health needs were met through the gathering of any medical history and referral for and follow-up to medical care to ensure the provision of developmental evaluation and treatment for children who were developmentally delayed pursuant to Florida Administrative Code Rule 65C-30.006;

x.  To ensure that SOUNG LANAZA'S mental health needs were met through referral for and follow-up to ensure the provision of a CBHA and any assessments, evaluations

and treatment necessary for mental health problems pursuant to Florida Administrative Code Rule 30.006.

      y.   To prepare the caregiver, prior to the placement of SOUNG LANAZA with her, as to how to meet her many and varied special needs pursuant to Florida Administrative Code 65C-28.005;

      z.   To ensure that the child's special, physical, medical, developmental, educational or emotional needs were met upon placement pursuant to Florida Administrative Code Rule 65C-28.004 and 65C-30.011;

      aa. To ensure that upon the placement of a child, all health care facts regarding the child are discussed with the caregiver; all health care and Medicaid information contained in the child's resource record are reviewed with the caregiver; appropriate information and instruction concerning the use of medically assistive devices are provided to the caregiver;  pursuant to Florida Administrative Code Rule 30.011;

      bb. To ensure that when a child is placed out of state pursuant to the Interstate Compact on the Placement of Children, that the services worker maintains contact at a minimum of every thirty (30) days with the supervising worker in the other state to obtain updates regarding the child and family's progress;

      cc. To provide the necessary support to strengthen and maintain the child's placement over time pursuant to Florida Administrative Code 65C-28.005;

      dd. To inform and educate the caregiver about available programs that may provide financial and medical assistance for the child pursuant to Florida Administrative Code 65C-28.005;

ee. To provide the caregiver with information regarding the dependency process and support services available in the community pursuant to Florida Administrative Code 65C-28.005;

ff. To inform the caregiver of all identified needs of the child and the need to provide services for those needs pursuant to Florida Administrative Code 65C-28.005;

gg. To ensure that the caregiver is provided with education, training, and support necessary to enable her to meet the child's physical, medical, emotional, psychological, developmental, and educational needs pursuant to Florida Administrative Code Rule 30.012;

hh. To ensure that significant events in the child's life are recorded in a format that can be used by subsequent caregivers and professionals pursuant to the Florida Administrative Code;

ii. To maintain, review, and provide the foster parent with a Child Resource Record with a complete record of the child's health records pursuant to Florida Administrative Code 65C-28.005 and 65C-30.011;

jj. To ensure that the Child Resource Record is developed, monitored, and updated, after every health care, psychological, psychiatric, behavioral and educational service or assessment provided to the child, pursuant to Florida Administrative Code Rule 65C-30.011;

kk. Notwithstanding her disabilities, to assess and provide for pre-independent living services for SOUNG LANAZA upon turning thirteen years of age and independent living services upon turning fifteen years of age pursuant to Florida Administrative Code 65C-28.009(7)(d);

ll. To ensure that permanency goals are selected based on the best interest of the child and to ensure that the case documentation provides justification that the permanency option

recommended to the court is the most appropriate one for the child pursuant to Chapter 39 and Florida Administrative Code Rule 65C-30.012;

mm.    To ensure that upon the selection of Permanent Guardianship as a permanency goal, that the prospective guardian is informed that the child will not be eligible for any Independent Living programs post-age eighteen (18) benefits pursuant to Florida Administrative Code Rule 65C-30.012;

nn. To ensure that the child and relatives were not likely to need supervision or services from OUR KIDS and/or ONE HOPE to ensure the stability of the permanent guardianship when the recommendation was made to terminate supervision with a goal of permanent guardianship pursuant to Florida Statute § 39.6221, Florida Administrative Code Rules 65C-30.012 and 65C-30.022, and CFOP 175-47.

oo. To ensure that SOUNG LANAZA'S case filed contained a hard copy of chronological record of case activities with a complete recording made at the time of or immediately following the event or contact pursuant to CFOP 175-42 and Florida Administrative Code Rule 65C-11.002;

147.   The DEPARTMENT, through its agents and/or employees, breached said non-discretionary, non-delegable duties in ways that included, but are not limited to:

a.      Failing to ensure SOUNG LANAZA'S health, safety, and welfare at all times when she was in the care and custody of the DEPARTMENT and/or its contracted and subcontracted providers;

b.      Failing to ensure that SOUNG LANAZA'S individual dignity, liberty, pursuit of happiness, and the protection of her federally guaranteed civil and other legal rights;

c.     Failing to ensure that SOUNG LANAZA received appropriate and timely medical care for her medical conditions, including, but not limited to corrective surgery to treat physical conditions related to cerebral palsy and hydrocephalus;

d.     Failing to properly respond to concerns indicating SOUNG LANAZA was being abuse and/or neglected while in the care and custody of the DEPARTMENT;

e.     Failing to timely initiate and follow-through with placement of SOUNG LANAZA through the Interstate Compact on the Placement of Children when the DEPARTMENT was notified in 1994 that there was a fit and willing relative in New York ready, willing, and able to care for SOUNG LANAZA on a permanent basis;

f.     Failing to ensure that SOUNG LANAZA achieved permanency within a twelve month period;

g.     Failing to ensure that SOUNG LANAZA received a Comprehensive Behavioral Mental Health Assessment;

h.     Failing to ensure that SOUNG LANAZA received services identified as being needed in a CBHA;

i.     Failing to ensure that SOUNG LANAZA received a full risk, health, educational, medical, and psychological screening, and assessment and testing upon adjudication into foster care;

j.     Failing to ensure SOUNG LANAZA's safety by providing necessary medical, emotional, psychological, psychiatric, and educational evaluations and treatment, as soon as practicable after identification of the need for such services by a screening and assessment process;

k.       Failing to ensure that SOUNG LANAZA'S caregiver received appropriate training to meet her special needs prior to placing her in New York;

l.       Failing to ensure that SOUNG LANAZA'S caregiver was provided with a complete Child Resource Record, including, but not limited to, prior medical records, and was informed of the need for follow-up procedures, including, but not limited to, shunt replacement surgery and corrective surgery for her legs, when SOUNG LANAZA was placed in New York;

m.       Failing to ensure that SOUNG LANAZA'S caregiver received sufficient funds to appropriately meet the financial, physical, mental, and behavioral needs of SOUNG LANAZA;

n.       Failing to ensure that SOUNG LANAZA received a Level of Care Assessment initially and an updated Level of Care Assessment when the need indicated;

o.       Failing to ensure that SOUNG LANAZA received a change in Level of Care when the need indicated;

p.       Failing to ensure that SOUNG LANAZA received appropriate services when she was placed in New York, including, but not limited to, Developmental Disability Services and Medicaid Waiver Services;

q.       Failing to ensure that SOUNG LANAZA'S case file was complete and that her case was ready for transfer when it was transferred to OUR KIDS and/or ONE HOPE;

r.       Failing to appropriately monitor its contract with OUR KIDS to assess OUR KIDS' performance in the areas of ICPC and services to children with developmental disabilities;

s.    Failing to ensure that OUR KIDS appropriately monitored its contract/agreement with ONE HOPE to assess ONE HOPE'S performance in the areas of ICPC and services to children with developmental disabilities;

t.    Failing to ensure that appropriate consent and/or court order was obtained prior to SOUNG LANAZA's taking of psychotropic medications;

u.    Failing to ensure that SOUNG LANAZA received Independent Living services and Pre-Independent Living services upon turning the age of thirteen (13);

v.    Failing to ensure that SOUNG LANAZA's case was closed in an appropriate manner so that her financial, physical, mental, and behavioral needs could be met long term;

148.   As a direct and proximate result of the aforementioned breach, Plaintiff SOUNG LANAZA was damaged by not receiving adequate care and services to address her developmental disabilities while in the care and custody of the state; by remaining in foster care for the majority of her minor life; and by suffering and continuing to suffer deterioration in her health. These losses are either permanent or continuing in nature and Plaintiff will suffer such losses in the future.

WHEREFORE, Plaintiff, SOUNG LANAZA demands judgment against Defendant FLORIDA DEPARTMENT OF CHILDREN AND FAMILY SERVICES, for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all matters so triable.

Dated:   April 25, 2012.

Respectfully submitted,

HOWARD M. TALENFELD, ESQ.
Florida Bar No. 312398
STACIE J. SCHMERLING, ESQ.
Florida Bar No. 0083862
Counsel for Plaintiff
COLODNY FASS TALENFELD
KARLINSKY & ABATE, P.A.
One Financial Plaza, 23rd Floor
100 S. E. Third Avenue
Fort Lauderdale, FL 33394
Telephone:     954 492 4010
Facsimile:     954 492 1144
Email address: htalenfeld@cftlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of April, 2012, that the foregoing document was served via U.S. Mail and/or electronic mail on all counsel and/or pro se parties of record as identified on the Service List below.

HOWARD M. TALENFELD, ESQ.
STACIE J. SCHMERLING, ESQ.

## SERVICE LIST

Deotha Woodburn
937 East 56 Street, #2A
Brooklyn, NY 11234
(Former Pro Se Plaintiff)

Craig S. Hudson, Esq.
Jeannie Liebegott, Esq.
Marshall Dennehey Warner Coleman & Goggin
One East Broward Blvd., Suite 500
Fort Lauderdale, FL 33301
Counsel for Kids Hope United Florida Region, Inc., and Nakeitha Sweeting Hodrick
Email:  cshudson@mdwcg.com

Blake S. Sando, Esq.
Cody German, Esq.
Cole Scott & Kissane, P.A.
Dadeland Centre II – 14th floor
9150 South Dadeland Blvd.
Miami, FL 33156
Counsel for Defendant, Our Kids, Inc., and Frances Allegra
Email:  Blake.Sando@csklegal.com

Monica Galindo Stinson, Esq.
Charles Fahlbusch, Esq.
Assistant Attorney General
Office of the Attorney General
110 S. E. 6 Street, 10th floor
Fort Lauderdale, FL 33301
Counsel for State of Florida Department of
Children & Families and Estate of Olga Rojas
Email:  monica.stinson@myfloridalegal.com

Bernard Perlmutter, Esq.
University of Miami School of Law
Children & Youth Law Clinic
1311 Miller Drive, Suite F-305
Coral Gables, FL 33146
Next Friend for the Minor Plaintiff
Email: bperlmut@law.miami.edu